793 So.2d 1013 (2001)
Jasmine ACHUMBA, etc., Appellant,
v.
Charles L. NEUSTEIN, M.D., Appellee.
No. 5D00-2486.
District Court of Appeal of Florida, Fifth District.
July 6, 2001.
Rehearing Denied September 12, 2001.
*1014 Martin J. Goldberg, Don Geier and A. Scott Toney, of Goldberg Law Office, Gainesville, for Appellant.
Kelly G. Hamer and M. Suzanne Christolini of Siboni, Hamer & Buchanan, P.A., Ocala, for Appellee.
ORFINGER, R.B., J.
Jasmine Achumba (Achumba), as personal representative of the estate of Larry Honor (Honor), deceased, appeals the trial court's summary judgment finding that Natre Smoot (Smoot) is not Honor's "survivor," as defined by the Florida Wrongful Death Act.[1] We have jurisdiction pursuant to Florida Rule of Appellate Procedure 9.110(k). Finding no error in the trial court's judgment, we affirm.
Achumba, Smoot's mother, was married to Ruebin S. Beckford (Beckford) at the time of Smoot's birth. Beckford was listed on Smoot's birth certificate as her father. Subsequent to Smoot's birth, Achumba and Beckford divorced. Achumba, in her capacity as personal representative of Honor's estate, brought a claim on behalf of Smoot pursuant to the Wrongful Death Act against Charles L. Neustein, M.D. (Neustein) contending that Neustein provided negligent medical treatment to Honor which resulted in his death.
In her complaint, Achumba alleges that Honor is Smoot's biological father, though Achumba and Honor were never married to each other. In support of her claim, Achumba produced a letter, purportedly signed by Honor, wherein he acknowledged paternity of Smoot.[2] Therefore, Achumba maintains that Smoot is entitled to recover under section 768.18 as Honor's "survivor." After answering the complaint, Neustein filed a motion for summary judgment arguing that Smoot could not be Honor's "survivor" pursuant to section 768.18(1), because she was born during the marriage between Achumba and Beckford, and Beckford is listed on Smoot's birth certificate as her father.[3] Achumba asserts that Smoot is a survivor pursuant to section 768.21(1), because she was born "out of wedlock of the father," and Honor recognized a responsibility for her support. For the following reasons, we disagree with Achumba's arguments.
Section 768.18(1) defines survivors thusly:
"Survivors" means the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters. It includes the child born out of wedlock of a mother, but not the child born out of wedlock of the father unless the father has recognized a responsibility for the child's support.
Because Smoot was born during the marriage of Achumba and Beckford, and Beckford is listed on Smoot's birth certificate as the father, there is a presumption of paternity in favor of Beckford. Contino v. Estate of Contino, 714 So.2d 1210, 1214 (Fla. 3d DCA 1998). Under Florida law, Beckford is Smoot's "legal father."[4]See Dep't of Health & Rehabilitative Servs. v. *1015 Privette, 617 So.2d 305, 307 (Fla.1993). Hence, she was not, as asserted by Achumba, born "out of wedlock of the father." To recognize Honor as Smoot's father would necessarily impugn Beckford's parental rights. A child's legally recognized father has an unmistakable interest in maintaining the relationship with his child unimpugned. See id.; see also Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
Historically, Florida's common law viewed any action challenging a child's legitimacy with great disfavor. G.F.C. v. S.G. & D.G., 686 So.2d 1382, 1384 (Fla. 5th DCA 1997). "There existed almost an irrebuttable presumption that the husband was the father of his wife's children, a presumption which could be overcome only upon a showing that the husband either was impotent or lacked access to his wife at the time of conception." Id. However, modern improvements in genetic testing have now made it possible to conclusively determine the paternity of children whose parentage may be at issue. Perhaps as a result of the increasing number of children whose paternity is called into question, the supreme court ruled that paternity and legitimacy are separate and distinct concepts. Daniel v. Daniel, 695 So.2d 1253 (Fla.1997). After Daniel, any child born during a lawful marriage is considered "legitimate," irrespective of his or her biological connection, or lack thereof, to the mother's husband.[5]
Because paternity and legitimacy are no longer synonymous, Smoot's legitimacy would not be affected if the court allowed her to maintain an action against Neustein as Honor's survivor. However, the same cannot be said about her paternity. Smoot can only be Honor's "survivor" if the law is prepared to recognize Honor as her father. But, as previously discussed, Smoot has a "legal father." Unless, and until, Beckford's status as her "legal father" is changed, Honor cannot be recognized as Smoot's father no matter what his biological relationship to her may be. More than a mere allegation of biological fatherhood is necessary to terminate one's status as a "legal father." G.F.C., 686 So.2d at 1387. Achumba or Smoot must take some legally recognized action, that considers the due process rights of all interested parties, to terminate Beckford's parental rights while simultaneously recognizing Honor's. Contrary to Achumba's argument, Florida does not recognize dual fathership.[6]G.F.C., 686 So.2d at 1386; see also Fernandez v. McKenney, 776 So.2d 1118, 1121 n. 5 (Fla. 5th DCA Feb.9, 2001) (Sharp, J., concurring) ("A child can have only one legal father ... and that determination will resolve which man will enjoy the rights and responsibilities of fatherhood...."). Simply put, Smoot cannot have two legally recognized fathers at the same time.
*1016 We believe that Smoot's paternity cannot be resolved in the context of a wrongful death action. This is true for several reasons, not the least of which is that chapter 742, Florida Statutes, not the Wrongful Death Act, is the exclusive remedy for establishing paternity in Florida. Amendments to Florida Family Law Rules of Procedure, 723 So.2d 208, 211 (Fla.1998); P.N.V. v. Washington, 654 So.2d 1274, 1275 (Fla. 2d DCA 1995). Of equal importance is that Beckford's due process rights, as Smoot's "legal father," were not considered in the pending wrongful death action. The relationship between a parent and child is constitutionally protected. Parham v. J.R., 442 U.S. 584, 604, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). As such, that relationship cannot be altered or impugned without considering the "legal father's" due process rights to maintain his relationship with the child, which was not done in this case.
We recognize that Florida courts will continue to be confronted with similar issues relating to children. As we did in G.F.C., we urge the Legislature to more clearly define the state's policy with regard to the rights of children and fathers.[7] Until then, we are reluctant to impugn the paternity of children and interfere in the relationship of those children and their fathers without clear legislative authority to do so.
AFFIRMED.
PETERSON, J., concurs.
GRIFFIN, J., dissents with opinion.
GRIFFIN, J., dissenting.
I respectfully dissent because I doubt both the accuracy and the wisdom of the premise on which the majority opinion is based. The majority posits that because Smoot has a "legal" father, she cannot qualify as a statutory "survivor" of her natural father for purposes of a wrongful death act. Unless and until the legal father, Beckford, is displaced by Honor as the "legal" father by a judgment in a paternity proceeding, no survivor's claim is possible. This is apparently because recognition of the survivor's claim is deemed tantamount to the creation of a "dual fathership" and Florida law only allows one father-child relationship to which the courts of Florida will accord any recognition. It seems, however, that Daniel v. Daniel, 695 So.2d 1253 (Fla.1997), suggests otherwise. Daniel recognizes the dichotomy between the legal father (the one married to the mother at the child's birth) and the natural father. The court even notes that a woman's marriage to a man other than the natural father of her child cannot affect the child's "natural lineage". Id. at 1255.
The first question is whether Florida law can afford any significance to the child's "natural lineage" where the legal father and the natural father are different. The answer appears to be "yes." In In re Estate of Robertson, 520 So.2d 99 (Fla. 4th DCA 1988), the court held that a person born to an intact marriage, thus having a "legal father", may nevertheless take by intestate succession from the child's natural father. Id. at 101-102. It is not necessary *1017 in such a case to institute a paternity proceeding to have the natural father declared the legal father. The legislature has seen fit to recognize the "natural lineage" by permitting the natural child to inherit from his or her biological father. Such a claim is adjudicated in a probate proceeding. Robertson.
Since Florida law recognizes that "dual fathership" is possible to this extent, the next question is whether the legislature intended that the natural children of a victim of wrongful death similarly recover a share of the biological's father estate and, where appropriate, recover pain and suffering damages for his loss. The intestate succession statute ruled on in Robertson[1] provided:
For the purpose of intestate succession... a person born out of wedlock is ... a lineal descendant of his father and is one of the natural kindred of all members of the father's family....
(Emphasis added.) The Wrongful Death Act provides:
"Survivors" means the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters. It includes the child born out of wedlock of a mother, but not the child born out of wedlock of the father unless the father has recognized a responsibility for the child's support.[2]
Not surprisingly, these two statutes are similar. If Robertson is correct that the existence of a legal father does not prevent a natural child from inheriting by intestate succession, the Wrongful Death Act should likewise be interpreted to allow the natural child to be a wrongful death claimant. Contrary to the view of the majority, allowing a child to share in the estate of the natural father through intestate succession or through a wrongful death proceeding in no way impugns or alters the legal father's relationship with the child.
There are also practical considerations that make it desirable for this issue to be raised and determined in the wrongful death proceeding. First of all, the wrongful death statute of limitations is only two years. This is precious little time in today's courthouses to obtain a judgment in a paternity proceeding that establishes a "legal" parent-child relationship as a prerequisite to having standing to assert a wrongful death claim. There is no reason the relationship of the natural child to the wrongful death victim cannot simply be alleged and proved up in a wrongful death action. Second, assuming my premise that the legislature has the power to allow a natural child of a wrongful death victim to recover for his loss even if he has a "legal" father, a judicial rule requiring the child to choose between fathers (at least one of whom is already dead) by undertaking a paternity suit to which the legal father ( if he is living) must be joined as a real party in interest seems both odd and awful. I would allow appellant to pursue her claim in the wrongful death suit.
NOTES
[1] §§ 768.16-.27, Fla. Stat. (1999).
[2] Neustein disputes the authenticity of the letter. However, for the purpose of considering Neustein's motion for summary judgment, the trial court treated the letter as authentic. For purposes of this appeal, this court does the same.
[3] See § 382.013(2)(a), Fla. Stat. (1999).
[4] Florida courts have held that even in cases of absolute proof as to the identity of a child's father, this, without more, will not constitute grounds to grant a paternity petition. Dep't of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305, 309 (Fla.1993). Clearly, biology is not the only factor utilized to determine paternity.
[5] According to Daniel, "legitimacy" now means the status of a child born or conceived during a lawful marriage, whether or not the child received half of his or her genes from the husband, while "paternity" means the status of being the natural or biological father of a child. Daniel, 695 So.2d at 1253. See also Judge R. Thomas Corbin & Rana Holz, Distinguishing Legitimacy From Paternity: Has Legitimacy Become a Label Without Substance Under Florida law?, Fla. B.J., Jan.1999, at 57.
[6] Taken to its extreme, Achumba's position could lead to odd results. For example, if Beckford and Honor had been killed in a common accident, could Smoot maintain a wrongful death action for both men claiming that Beckford was her "legal father" and Honor was her biological father? Since Florida law does not recognize the concept of "dual fathership," we believe that appropriate action must be taken to terminate Beckford's parental rights before Honor could be recognized as Smoot's father.
[7] Many commentators have written extensively on related subjects. See, e.g., Chris W. Altenbernd, Quasi-Marital Children: The Common Law's Failure in Privette and Daniel Calls for Statutory Reform, 26 Fla. St. U.L.Rev. 219 (1999); Judge R. Thomas Corbin & Rana Holz, Distinguishing Legitimacy From Paternity: Has Legitimacy Become a Label Without Substance Under Florida Law?, Fla. B.J., Jan. 1999, at 57; Kimberly G. Montanari, Note, Does the Presumption of Legitimacy Actually Protect the Best Interests of the Child?, 24 Stetson L.Rev. 809 (1995).
[1] § 732.108(2)(b), Fla. Stat. (1985).
[2] § 768.18(1), Fla. Stat. (2000).